RECEIVED
2/3/09
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES, LOUISIANA

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 2:06 CR 20103 |
| VS. | : | JUDGE MINALDI |
| KEITH SMITH<br>WAYNE ADAMS | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Presently before the court are the defendants' and the Government's objections to the Presentence Report ("PSR") prepared by the Probation Department.

After receiving objections by the Government, Probation revised the PSR to incorporate the information provided. This does not require a ruling by the court.

The defendants assert that there are "factual and legal inaccuracies" in the PSR. The defendants have asked for an evidentiary hearing to determine these inaccuracies. PSR's generally bear sufficient indicia of reliability to be considered by a district court; the defendant bears the burden of showing the information is untrue or unreliable. *United States. v. Roach*, 201 Fed.App'x. 969, 977 (5th Cir. 2006); *United States v. Rome*, 207 F.3d 251, 254 (5th Cir.2000). This court is adopting the PSR, therefore, the defendants will be given an opportunity to show that the information contained in the PSR is untrue or unreliable.

The defendants object to ¶37 of the PSR, stating that this sentence should read "U.S.S.G. §2L1.1(a)(2) rather than (a)(3). This is essentially a difference between the 2005 and 2007 guidelines. The older edition provided no advantage to the defendants, so the 2007 edition was used.

The base offense level in the 2007 edition is found at U.S.S.G. §2L1.1(a)(3). This objection is OVERRULED.

The defendants next assert that ¶38 should be zero (0) "in that the government failed at the trial to prove that the defendant was accountable for harboring more than five (5) aliens." The defendants argue that because the PSR contains facts not presented at trial, these facts should not be considered as the court is restricted to only the evidence at trial. Based upon the facts presented at trial, the defendants argue that they should not be assessed with the nine-point enhancement pursuant to U.S.S.G. §2L1.1(b)(2).

The court is not restricted solely to facts presented during the trial of this case. Even in the discretionary sentencing system established by *Booker/Fanfan*[1], a sentencing court must still carefully consider the detailed statutory scheme created by the Sentencing Reform Act and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity. Although *Booker* excised the mandatory duty to apply the Guidelines, the sentencing court remains under a duty pursuant to § 3553(a) to "consider" numerous factors including the following:

(4) the kinds of sentence and the sentencing range established for-

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-

---

[1] *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (U.S. 2005).

>(I) issued by the Sentencing Commission....

(5) any pertinent policy statement-

(A) issued by the Sentencing Commission ....

18 U.S.C. § 3553(a)(4), (5).

This duty to "consider" the Guidelines will ordinarily require the sentencing judge to determine the applicable Guidelines range even though the judge is not required to sentence within that range. The Guideline range should be determined in the same manner as before *Booker/Fanfan*. Relatedly, *Booker* contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. 125 S.Ct. at 750, 764. The sentencing judge is entitled to find by a preponderance of the evidence *all the facts relevant* to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.[2] *United States v. Mares*, 402 F.3d 511, 518-519 (5th Cir. 2005).

The defendants argue that the Government did not allege a specific number of aliens in the Second Superseding Indictment, and they proved the existence of no more than six illegal aliens at trial. To determine the number of illegal aliens, the court considers relevant conduct.

U.S.S.G. §1B1.3. Relevant Conduct (Factors that Determine the Guideline Range) states:

**(a) Chapters Two (Offense Conduct) and Three (Adjustments).** Unless otherwise

---

[2] Under U.S.S.G. § 6A1.3(b)(2004), which remains in effect, the district court is required to "resolve disputed sentencing factors ... in accordance with Rule 32(i), Fed.R.Crim.P." The Commentary to this Guideline provides for use of the preponderance of the evidence standard.

specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

**(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

**(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)** solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)** all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)** any other information specified in the applicable guideline.

**(b) Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence).** Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

USSG, § 1B1.3, 18 U.S.C.A.

The PSR and the evidence at trial established that several confidential informants and anonymous sources had reported from 50 to over 200 illegal aliens housed in a warehouse on Opelousas Street in Lake Charles, Louisiana. Co-defendant Sergio Alire was recorded stating to confidential informants that he housed over 200 illegal aliens on at least one occasion, and on another occasion, he admitted to approximately 180 illegal aliens. These facts were supported by the evidence introduced at trial.

The PSR and the evidence introduced at trial established in excess of 100 illegal aliens. All of the information contained in the PSR was derived from investigative reports from the Department of Homeland Security, Immigration and Customs Enforcement (ICE). In addition to the investigative efforts of local law enforcement officials and agents of federal law enforcement agencies, the reports also include information obtained from interviews with co-conspirators, both indicted and unindicted.

These reports indicate that on April 25, 2006, ICE agents were contacted by the Fort Polk Provost Marshal's Office concerning five (5) aliens, detained for attempting to unlawfully enter a military base. A search of Immigration databases resulted in no identifiable match to the aliens in custody, but later, three of the aliens were determined to be lawfully present in the United States and were released from custody. The remaining two subjects, Mexican nationals Adelimiro Camara-Pineda and Romeo Galvez-Roblero admitted to entering the country illegally. Camara-Pineda and Galvez-Roblero advised they were employed by Dunham Price for the past five and seven months respectively, earning $9.00 per hour and were housed in a company trailer. They were not required to provide any documentation to work for Dunham Price and both aliens believed their employer to

be aware they were illegally in the country. They named Sergio Alire as their supervisor.

In April 2006, Border Patrol agents became involved with an investigation by the Lake Charles Police Department of two subjects arrested for Driving Under the Influence and Hit and Run. The two defendants admitted they were illegally present in the United States. They presented employment cards from American Workforce Solutions ("AWS") (also known as International Workforce Solutions) and stated their boss was Sergio Alire. The aliens took police officers to a warehouse located at 5505 Opelousas Street, Lake Charles, Louisiana. The warehouse was lined with bunk beds, stacked end-to-end and side-by-side, with only enough room to walk between the beds. Over fifty (50) Hispanic males were in the sleeping area, none of whom spoke English. The sleeping area appeared to accommodate approximately one hundred (100) men. Also on the property at the Opelousas Street site were three trailers, used as sleeping quarters similar to the warehouse. It was estimated that between 250 to 300 illegal aliens were living at the facility. Utilities to the building were registered under the name AWS. Officers with the Lake Charles Police Department stated that there had been a large number of traffic accidents and DUI's involving illegal aliens without identification and insurance who reported 5505 Opelousas Street as their address. Sergio Alire was considered to be the company's liaison to the workers.

In an investigation separate from Border Patrol, ICE agents received information from an anonymous source on May 1, 2006, advising that AWS was housing between 150 and 200 Hispanic males in a commercial building, located at 5505 Opelousas Street. The nationality of the males included Mexican, Honduran, El Salvadoran, Puerto Rican, and Dominican. The immigration status of the males included legal permanent residents, illegal aliens, and prior deportees. Information provided to ICE agents indicated there were approximately 100 sleeping cots throughout the building

and four trailers on the side of the building, also containing sleeping quarters. A security guard was on duty at the commercial building and no dogs or weapons were at the location, according to the anonymous source. Sergio Alire was employed by AWS as a supervisor/overseer/recruiter of the Hispanic males. Alire was reportedly paid $4,000.00 a week to recruit employees for AWS. Alire's business cards showed he was employed by R&R Contractor Services, LLC, P.O. Box 364, 10523 Highway 105, Melville, Louisiana. Alire frequented Hispanic stores and Wal-Mart in order to solicit employees. AWS hired the recruited individuals to work for various companies throughout the Lake Charles area, including the Dunham Price Group. Alire provided safety rules and regulations for R&R to the employees in Spanish and English, along with his business card.

As the investigation continued through May 2006, ICE agents learned that, in addition to recruiting the illegal workers, Alire was responsible for overseeing the daily operations of the employed aliens. Surveillance frequently observed Alire at the Opelousas site. Transportation of employees to and from the various work sites was provided by the employer and consisted of several different buses. There were two main shifts for the workers, the first beginning at 5:00 A.M. daily. In addition to the aliens housed on Opelousas Street, one bus traveled from the Sunrise Inn Motel, where approximately 50 to 60 Hispanic males resided, to and from three area petrochemical plants (including Citgo, Conoco-Phillips, and SASOL North America). Another bus would make trips, beginning around 5:00 A.M., to and from Opelousas Street to the Dunham Price Cement Plant, usually transporting between 80 and 100 Hispanic males.

The anonymous source further advised ICE agents that three Hispanic females, Delmi Arita, Olga Moreira, and Marta Madonado, resided at 317 Calcasieu Street, Lake Charles, Louisiana, and the females would prepare and deliver meals to Opelousas Street twice a day. Surveillance confirmed

that a vehicle registered to Alire would deliver the meals.

During the course of the investigation, numerous "trash runs" were conducted, revealing numerous documents illustrating pay scales, names of employees, housing situations, shift assignments, status of workers (to include day or night shift, laid off, fired, vacation, went to Mexico not coming back, etc), a hand-written document stating "nine guys not working at the camp, 117 in the camp, 36 guys live outside the camp," and AWS's client accounts, billing and employees. Additionally, a document was located titled "Lake Charles Camp Dissolution" showing the building lease terminated on November 18, and detailed outstanding debt in the amount of $24,037.00, including the building lease ($4,000.00), Trailer DeMobe ($6,559.00), bed tear down, clean-up, and removal of showers and toilets ($7,500.00), rent storage for inventory ($1,200.00) and total camp dissolution ($39,296.00 minus $4,000.00 deposit, equals $35,296.00). Another document from AWS/R&R, All Bills Outstanding, showed Amy Taylor associated with a $100.00 bill for auto repairs. (A vehicle registered to Taylor was observed on numerous occasions at Opelousas Street.) Townley, one of the owners of International Workforce Solutions, is referenced with a $3,700.00 bill for a mini van. Documents also show signatures by Taylor for petty cash expenses and reports. The expenses include automotive gasoline, employee meals, supplies, and janitorial supplies. Documents were also found for American Workforce Solutions, which revealed that Smith and Adams appeared to be receiving monthly draws totaling over $4,000.00 each.

At trial, six illegal aliens harbored by the defendants testified as to their respective immigration status and how they came to work for the defendants.[3] Two other individuals,

---

[3] Sergio Alire, recruiter; Delmy Aracely Arita-Lara, cooked meals for illegal workers at the warehouse and sheltered by the defendant; Gerardo Ortega Ramos-Pastor ("Jerry Ramos"),

Adelimiro Camara-Pineda and Romeo Galvez-Roblero, were arrested and admitted to being illegal and working for Sergio Alire. Law enforcement testimony at trial also established a cross-section of fourteen (14) workers traveling on the bus from the camp to Dunham Price were also found to be in the United States illegally.

Payroll spreadsheets were introduced at trial with hundreds of Hispanic names reflecting the pool of workers at any given time. Although there was testimony that not *everyone* lived at the "camp" on Opelousas Street, the same testimony established most of the immigrant workers had to because they had no other place to go. This was a "camp" equipped to house over one hundred workers at a time, and the testimony was clear from everyone who worked there, including Amy Taylor, Bruce Slinker, Jerry Ramos and Jack Ewing – an overwhelming majority of the residents were illegal.

Trial testimony also revealed that Alire hired mostly illegal workers. Sergio Alire's testimony corroborated the other testimony, that a high percentage of the residents at the camp were illegal because that is who he hired – undocumented Hispanic people.

Brenda and Tricia Frame, employees of RodneyRyder, also testified at trial there was little, if any, paperwork on these illegal workers. Some files had nothing, while others had only preliminary information requested of each worker on a form written in Spanish and handed to them as they signed up for work. This information was analyzed by James Malooley, an Immigration and Customs Enforcement (ICE) Intel Specialist. Of all the workers employed by the "Alliance," 169 names had enough information to analyze. Mr. Malooley's conclusion was that 10 appeared to be in the United

---

security at the warehouse; Luis A. Pinto, illegal worker; Elmer Antonio Caballer-Quintanilla, illegal worker; and Hugo Adalid Pinto-Galdamez, illegal worker.

States lawfully, while 159 appeared to be illegal. This conclusion was based on an analysis and cross-reference of the information provided, with information kept on several private databases and the Central Indexing System. While Mr. Malooley admitted the preferred method and only absolute way to definitely determine status would be by fingerprints or papers, both of which could not be obtained, his testimony also corroborates the other testimony and facts in this case.

The evidence contained in the PSR and introduced at trial, including relevant conduct, is sufficient to establish that Adams, Smith and their co-defendants harbored over 100 illegal aliens and the 9-level enhancement is warranted. This objection is OVERRULED.

Adams and Smith also submit that they should receive a downward adjustment to the guidelines and should be sentenced to probation. The court will consider the defendants' argument in favor of a downward departure and will discuss this decision further at the sentencing hearing.

Lake Charles, Louisiana, this __5__ day of February, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE